**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: October 07, 2021

Mr. Charles L. Bogren
Mr. Michael S. Bogren
Plunkett Cooney
333 Bridge Street, N.W.
Suite 530
Grand Rapids, MI 49504

Ms. Josephine A. DeLorenzo
Plunkett Cooney
38505 Woodward Avenue
Suite 100
Bloomfield Hills, MI 48304

Mr. David A. Kallman
5600 W. Mount Hope Highway
Lansing, MI 48917

        Re:  Case No. 21-2945, *Emily Dahl, et al v. Bd of Trs. of W.M.U., et al*
             Originating Case No. : 1:21-cv-00757

Dear Counsel,

  The attached order designated for full-text publication was filed today in this case.

                              Yours very truly,

                              Deborah S. Hunt, Clerk

                              Cathryn Lovely, Opinions Deputy

cc:  Mr. Thomas Dorwin

Enclosure

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0234p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

EMILY DAHL; HANNAH REDOUTE; BAILEY KORHORN; MORGAN OTTESON; JAKE MOERTL; KIA BROOKS; AUBREE ENSIGN; REILLY JACOBSON; TAYLOR WILLIAMS; KAELYN PARKER; ANNALISE JAMES; MAXWELL HUNTLEY; SYDNEY SCHAFER; DANIELLE NATTE; NICOLE MOREHOUSE; KATELYN SPOONER,
⎫
⎬ No. 21-2945
⎭

*Plaintiffs-Appellees*,

*v.*

BOARD OF TRUSTEES OF WESTERN MICHIGAN UNIVERSITY; EDWARD MONTGOMERY, KATHY BEAUREGARD; TAMMY L. MILLER,

*Defendants-Appellants*.

On Emergency Motion to Stay Injunction Pending Appeal

United States District Court for the Western District of Michigan at Grand Rapids;
No. 1:21-cv-00757—Paul Lewis Maloney, District Judge.

Decided and Filed:  October 7, 2021

Before:  GUY, McKEAGUE, and READLER, Circuit Judges.

_____

**COUNSEL**

**ON MOTION:** Michael S. Bogren, PLUNKETT COONEY, Grand Rapids, Michigan, for Appellants. **ON RESPONSE:** David Kallman, GREAT LAKES JUSTICE CENTER, Lansing, Michigan, for Appellees.

---

## ORDER

---

PER CURIAM.  Western Michigan University, a public university, requires student-athletes to be vaccinated against COVID-19, but it considers individual requests for medical and religious exemptions on a discretionary basis.  Sixteen student-athletes applied for religious exemptions.  The University ignored or denied their requests and barred them from participating in any team activities.  The student-athletes then sued, alleging, among other things, that University officials violated their free exercise rights.  The district court preliminarily enjoined the officials from enforcing the vaccine mandate against plaintiffs.  Now, the officials ask us to stay the injunction and proceedings in the district court pending appeal.  Although it is a close call, because the free exercise challenge will likely succeed on appeal, the factors considered in granting a stay favor the student-athletes.  Accordingly, we decline to issue a stay.

I.

According to a recently announced University policy, "to maintain full involvement in the athletic department" at Western Michigan, students must be vaccinated against COVID-19.  The policy, as announced by text message, states that "[m]edical or religious exemptions and accommodations will be considered on an individual basis."  Several student-athletes sought religious exemptions.  In some cases, the University denied the student-athlete's application, stating that the applicant would have "[n]o participation in Intercollegiate sports."  In other cases, the University failed to respond but still barred the student-athlete from further participation in college sports.  And the University official who processed the applications confirmed that she barred every unvaccinated student-athlete from "engag[ing] in team activities."

This lawsuit followed.  Sixteen student-athletes alleged that University officials violated their rights under federal and state law, including the First Amendment's Free Exercise Clause.  The district court issued a preliminary injunction allowing plaintiffs to participate in team activities without being vaccinated.  The district court's order did, however, allow the University to require plaintiffs to wear face coverings and take COVID-19 tests to participate in athletic

events.  In conjunction with their appeal of that ruling, defendants asked the district court to stay the injunction.  The district court, however, denied the motion to stay.  Defendants now ask us to stay both the preliminary injunction and the district court's proceedings during the appeal.

II.

To determine whether to grant a stay pending appeal, we consider "(1) the likelihood that the party seeking the stay will prevail on the merits; (2) the likelihood that the moving party will be irreparably harmed; (3) the prospect that others will be harmed by the stay; and (4) the public interest in the stay."  *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016).  While no single factor necessarily is dispositive, *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006), the first—the likelihood of success—in many instances will be the "determinative factor" in our analysis, *Thompson v. DeWine*, 959 F.3d 804, 807, 812 (6th Cir. 2020) (per curiam).

Our review of the district court's decision to issue a preliminary injunction is "highly deferential."  *DV Diamond Club of Flint, LLC v. Small Bus. Admin.*, 960 F.3d 743, 746 (6th Cir. 2020) (citation omitted).  We will not overturn a preliminary injunction unless the district court "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard."  *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (citation omitted).  A factual finding, it has been colorfully analogized, is clearly erroneous if it "strike[s] us as wrong with the force of a five-week-old, unrefrigerated dead fish," *Carvajal Vasquez v. Gamba Acevedo*, 931 F.3d 519, 528 (6th Cir. 2019) (citation omitted), and we review legal determinations de novo, *S. Glazer's Distribs.*, 860 F.3d at 849.

III.

Beginning, then, with the likelihood that defendants will succeed on the merits of their appeal, we focus on the strength of plaintiffs' free exercise claim.  *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 482 (6th Cir. 2020) ("[P]reliminary injunctions in constitutional cases often turn on the likelihood of success on the merits . . . ."

Case 1:21-cv-00757-PLM-SJB ECF No. 40, PageID.422 Filed 10/07/21 Page 5 of 12 (5 of 12)

No. 21-2945  *Dahl, et al. v. Bd. of Trs. of W. Mich. Univ., et al.*  Page 4

(citation omitted)). To prevail, plaintiffs must show that defendants burdened their religious exercise and that defendants' conduct cannot withstand the appropriate level of scrutiny.

A.

The First Amendment, as incorporated through the Fourteenth Amendment, prevents a state from "prohibiting the free exercise" of religion. U.S. CONST. amend. I; *see Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 403 (6th Cir. 1999). Burdens on one's free exercise may be direct, as where a state criminalizes a particular faith or religious practice. *See Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 877–78 (1990). But "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions," also trigger scrutiny under the Free Exercise Clause. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017) (citation omitted). Accordingly, a policy that forces a person to choose between observing her religious beliefs and receiving a generally available government benefit for which she is otherwise qualified burdens her free exercise rights. *See Fulton v. City of Phila.*, 141 S. Ct. 1868, 1876 (2021); *Trinity Lutheran*, 137 S. Ct. at 2023. The reason is simple: denying a person "an equal share of the rights, benefits, and privileges enjoyed by other citizens" because of her faith discourages religious activity. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988). Consider *Fulton*. There, a city gave a foster agency the choice of foregoing a contract to place children with foster parents, which it deemed its religious "mission," or "approving relationships inconsistent with its beliefs." 141 S. Ct. at 1876. By putting that choice to the foster agency, the city impaired the foster agency's ability to exercise its faith. *Id.* at 1876. Similarly, *Sherbert v. Verner* held that denying unemployment benefits to a Seventh-day Adventist for not working on the Sabbath burdened her religious exercise. 374 U.S. 398, 400–03 (1963).

A party may mount a free exercise challenge, it bears noting, even where it does not have a constitutional right to the benefit it alleges is being improperly denied or impaired. That has long been true; the Supreme Court recognized over 50 years ago that "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege" as opposed to a right. *Sherbert*, 374 U.S. at 404 (collecting cases). And the Supreme Court has reinforced that principle time and again.

No. 21-2945  *Dahl, et al. v. Bd. of Trs. of W. Mich. Univ., et al.*  Page 5

Take, for example, *Trinity Lutheran*. There, a church sought to participate in a state program that awarded grants for playground resurfacing "on a competitive basis to [nonprofits] scoring highest based on several criteria." *Trinity Lutheran*, 137 S. Ct. at 2017. The church met these criteria, but the state denied its application solely because it was a religious entity. *Id.* at 2017–18. That decision, the Supreme Court explained, offended the Free Exercise Clause because it discouraged the church from exercising its First Amendment rights even though the church lacked "any entitlement to a subsidy." *Id.* at 2022–24.

Application of these benchmarks leads us to conclude that the University's failure to grant religious exemptions to plaintiffs burdened their free exercise rights. The University put plaintiffs to the choice: get vaccinated or stop fully participating in intercollegiate sports. The University did not dispute that taking the vaccine would violate plaintiffs' "sincerely held Christian beliefs." Yet refusing the vaccine prevents plaintiffs from participating in college sports, as they are otherwise qualified (and likely were recruited) to do. By conditioning the privilege of playing sports on plaintiffs' willingness to abandon their sincere religious beliefs, the University burdened their free exercise rights. *See id.*

Defendants respond that the Free Exercise Clause only prevents them from forcing plaintiffs to choose between their faith and a "generally available benefit," which, they say, does not aptly describe playing college sports. But in the free exercise context, "generally available" refers to "the baseline against which burdens on religion are measured." *Locke v. Davey*, 540 U.S. 712, 726 (2004) (Scalia, J., dissenting). For instance, state grants awarded to nonprofits "scoring highest based on several criteria" are generally available to eligible entities even though only 14 organizations (out of 44 applicants) received one. *Trinity Lutheran*, 137 S. Ct. at 2017–18, 2024; *see also Locke*, 540 U.S. at 727 (Scalia, J., dissenting) (noting that a state may condition a generally available benefit on "academic performance, income, and attendance at an accredited school"). It follows that all plaintiffs must show is that they are "otherwise eligible" to play intercollegiate sports—that is, eligible apart from the regulation that burdens their religious exercise. *See Trinity Lutheran*, 137 S. Ct. at 2021. And there is no question plaintiffs are otherwise eligible, as they are already student-athletes.

No. 21-2945    *Dahl, et al. v. Bd. of Trs. of W. Mich. Univ., et al.*    Page 6

Plaintiffs' unique ability to play sports helps frame our analysis with respect to the "coercion or penalt[y]" aspect of a free exercise claim. *Id.* at 2022. The Free Exercise Clause, we reiterate, "protects against 'indirect coercion or penalties on the free exercise of religion.'" *Id.* (citation omitted). For purposes of assessing whether the University has exerted coercive force or threatened a penalty to impede one's free exercise right, our focus is on student athletes. Fair enough, the University's vaccine mandate does not coerce a non-athlete to get vaccinated against her faith because she, as a non-athlete, cannot play intercollegiate sports either way. But the mandate does penalize a student otherwise qualified for intercollegiate sports by withholding the benefit of playing on the team should she refuse to violate her sincerely held religious beliefs. As a result, plaintiffs have established that the University's vaccination policy for student-athletes burdens their free exercise of religion.

B.

Of course, not every burden on the free exercise of religion is unconstitutional. A neutral law of general applicability "need not be justified by a compelling governmental interest" even if the law incidentally burdens religious practices. *Smith*, 494 U.S. at 886 n.3; *see also Mount Elliott Cemetery*, 171 F.3d at 403 (explaining that the state may "regulat[e] behavior associated with religious beliefs"). But a law that is not neutral and generally applicable "must undergo the most rigorous of scrutiny." *Monclova Christian Acad.*, 984 F.3d at 479 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)).

As the Supreme Court recently reaffirmed, a policy that provides a "mechanism for individualized exemptions" is not generally applicable. *Fulton*, 141 S. Ct. at 1877 (citation omitted). Accordingly, where a state extends discretionary exemptions to a policy, it must grant exemptions for cases of "religious hardship" or present compelling reasons not to do so. *Id.* (citation omitted). For example, a city that requires foster agencies to certify same-sex couples as foster parents "unless an exception is granted by the Commissioner . . . in his/her sole discretion" must provide a compelling reason not to extend a religious exemption to a Catholic foster agency. *Id.* at 1878. Similarly, a state that denies unemployment benefits to persons who refuse a suitable job "without good cause" must identify a "compelling state interest" not to grant an exemption to a Seventh-day Adventist who would not work on the Sabbath. *Sherbert*, 374

Case 1:21-cv-00757-PLM-SJB ECF No. 40, PageID.425 Filed 10/07/21 Page 8 of 12 (8 of 12)

No. 21-2945          *Dahl, et al. v. Bd. of Trs. of W. Mich. Univ., et al.*          Page 7

U.S. at 401, 406; *cf. Klaassen v. Trs. of Ind. Univ.*, --- F. Supp. 3d. ---, 2021 WL 3073926, at *25 (N.D. Ind. July 18, 2021), *aff'd*, 7 F.4th 592 (7th Cir. 2021) (holding that a university's vaccine mandate was neutral and generally applicable, and therefore subject to rational basis review, when it provided a *non-discretionary* religious exemption to students).

The University's vaccine mandate likewise provides a "mechanism for individualized exemptions." The policy says that "all student-athletes" must provide proof of at least one dose of a COVID-19 vaccine "to maintain full involvement in the athletic department." But "[m]edical or religious exemptions and accommodations will be considered on an individual basis." The University later provided forms on which student-athletes could request an "accommodation" to or an "exemption" from the vaccine mandate for religious reasons. And, like the city in *Fulton* and the state in *Sherbert*, the University retains discretion to extend exemptions in whole or in part. For this reason, the policy is not generally applicable. As a result, the University must prove that its decision not to grant religious exemptions to plaintiffs survives strict scrutiny. *See Fulton*, 141 S. Ct. at 1881.

Defendants resist this conclusion on several fronts. To start, they assert that the University's policy is neutral and generally applicable under *Fulton* and *Sherbert* because the University refused to allow any unvaccinated player to participate in college sports. But defendants' emphasis on how they in fact executed the policy ignores the Supreme Court's instruction that we put front and center the terms of the policy itself, as the "creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given." *Fulton*, 141 S. Ct. at 1879. That is so, the Supreme Court explained, because the existence of a system to grant individualized exceptions "'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude," *id.* (citation omitted), which, we note, fairly describes the policy at issue here. The University's policy says it evaluates whether to grant religious exemptions "on an individual basis," thereby rendering the policy not generally applicable regardless of whether the University has granted any exemptions.

Next, defendants ask us to consider that "[e]very student who applied for a religious exemption received one." To that end, the official who evaluated plaintiffs' applications claims

No. 21-2945  *Dahl, et al. v. Bd. of Trs. of W. Mich. Univ., et al.*  Page 8

she "in fact granted them an exemption from the vaccine requirement." But these representations do not square with the record. In at least two cases, the University barred plaintiffs from practice and competition without responding to their requests for exemptions. As for the rest, the University stated, in writing, that it had "denied" them exemptions. Based on the University's own documentation, the district court's factual finding that plaintiffs did not receive exemptions does not strike us as erroneous, let alone clearly so.

True, the University did maintain plaintiffs' athletic scholarships and did not formally dismiss them from their teams. But that is not the same thing as granting an exception from the University's policy of conditioning "full involvement in the athletic department" on vaccination status. After all, the purported exception plaintiffs received did not allow them to play college sports. Yet playing on the team (and not just receiving a scholarship) is their goal, a point the University itself recognized. *See, e.g.*, Religious Accommodation Request Form at 1, *Dahl v. Bd. of Trs. of W. Mich. Univ.*, No. 1:21-cv-757 (W.D. Mich. Sept. 13, 2021), ECF No. 15-7 (noting that plaintiffs sought exemptions that would allow them to keep "participating in Intercollegiate sports"). And by all accounts, plaintiffs have successfully achieved that goal, at least historically. Two have been team captains. Several have won All-Mid-American Conference awards or been named to All-Mid-American Conference or All-Region teams. They sought exemptions to continue those athletic endeavors, not simply to be "listed as a player on the team website," as the University offered. Because the University's "exemption" would not allow plaintiffs to engage fully in team activities, the district court did not clearly err by finding that the University denied plaintiffs' requests for exemptions in substance as well as form.

Finally, defendants invite us to decide this case based on the following assumption: that the University's policy forbids all unvaccinated student-athletes from participating in sports but allows those with medical or religious objections to retain their scholarships and avoid dismissal and discipline. The policy's text, however, says nothing of the sort. We thus see no error—much less clear error—in the district court's finding that "[t]he policy Defendants describe[] is not the policy Defendants sent to their student athletes." *Dahl v. Bd. of Trs. of W. Mich. Univ.*, No. 1:21-cv-757, slip op. at 7–8 (W.D. Mich. Sept. 13, 2021).

### C.

Because the University's policy is not neutral and generally applicable, we analyze the policy through the lens of what has come to be known as "strict scrutiny." *Fulton*, 141 S. Ct. at 1881. That manner of scrutiny requires defendants, to prevail, to show that the University's failure to exempt plaintiffs serves "'interests of the highest order' and is narrowly tailored to achieve those interests." *Id.* (citation omitted). The University's interest in fighting COVID-19 is compelling. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam). But the University falters on the narrow tailoring prong. For one, public health measures are not narrowly tailored if they allow similar conduct that "create[s] a more serious health risk." *Id.*; *see Lukumi Babalu Aye*, 508 U.S. at 544–45 (comparing the risks posed by ritual animal slaughter, hunting, and garbage disposal). That is the case at the University, which allows non-athletes—the vast majority of its students—to remain unvaccinated. One need not be a public health expert to recognize that the likelihood that a student-athlete contracts COVID-19 from an unvaccinated non-athlete with whom she lives, studies, works, exercises, socializes, or dines may well meet or exceed that of the athlete contracting the virus from a plaintiff who obtains a religious exemption to participate in team activities. For another, narrow tailoring is unlikely if the University's conduct is "more severe" than that of other institutions. *Brach v. Newsom*, 6 F.4th 904, 931 (9th Cir. 2021). To that point, several other universities grant exemptions from their COVID-19 mandates. *See, e.g.*, *Klaassen*, 7 F.4th at 593; *Wade v. Univ. of Conn. Bd. of Trs.*, --- F. Supp. 3d ---, 2021 WL 3616035, at *1 (D. Conn. Aug. 16, 2021); *see also* Univ. of Mich., *U-M COVID-19 DATA* (Oct. 5, 2021, 8:33 AM), https://campusblueprint.umich.edu/dashboard/ (reporting that approximately 2% of students at the University of Michigan's Ann Arbor campus have received COVID-19 vaccine exemptions).

Defendants, it bears noting, provided the district court with an affidavit stating that COVID-19 vaccines are "the most effective and reasonable way to guard against" the virus. We do not dispute that assessment. But the question before us "is not whether the [University] has a compelling interest in enforcing its [vaccine] policies generally, but whether it has such an interest in denying an exception" to plaintiffs, and whether its conduct is narrowly tailored to achieve that interest. *Fulton*, 141 S. Ct. at 1881. Defendants present neither evidence nor

No. 21-2945     *Dahl, et al. v. Bd. of Trs. of W. Mich. Univ., et al.*     Page 10

argument on that score. To the contrary, they contend only that their conduct survives rational basis review.

To sum up, defendants likely violated plaintiffs' First Amendment rights. The critical first stay factor thus favors plaintiffs. *See Thompson*, 959 F.3d at 807 (noting that "the likelihood of success on the merits often will be the determinative factor" to obtain a stay during an appeal (citation omitted)).

IV.

The remaining stay factors largely involve dueling considerations regarding who presumably will be harmed with (or without) a stay. And those considerations are less clear cut than our merits analysis. For example, the University presumably faces some risk that an unvaccinated player who participates in full with her team may spread COVID-19 to her teammates, threatening a forfeit of one or more games and possible (and arguably irreparable) financial or reputational injury to the University. But that possibility is somewhat speculative, and it fails to consider the broader picture. For one, the preliminary injunction applies only to plaintiffs—sixteen people—and the University's policy, even when enforced, does not limit an athlete's exposure to unvaccinated University students at large. For another, under the terms of the preliminary injunction, the University may still require plaintiffs to wear masks at practice and get tested for COVID-19, presumably ameliorating at least some risk associated with their participation. And then consider the interests of plaintiffs and the public more broadly. Enforcement of the University's policy likely would deprive plaintiffs of their First Amendment rights, an irreparable injury. *See Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). Proper application of the Constitution, moreover, serves the public interest, *Coal. to Def. Affirmative Action*, 473 F.3d at 252, as "it is always in the public interest to prevent the violation of a party's constitutional rights," *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). On balance, plaintiffs' strong likelihood of success on their free exercise claim carries the day.

No. 21-2945           *Dahl, et al. v. Bd. of Trs. of W. Mich. Univ., et al.*           Page 11

\* \* \* \* \*

We do not doubt defendants' good faith, nor do we fail to appreciate the burdens COVID-19 has placed on this nation's universities. To that point, our holding is narrow. Other attempts by the University to combat COVID-19, even those targeted at intercollegiate athletics, may pass constitutional muster. *See Klaassen*, 7 F.4th at 593. But having announced a system under which student-athletes can seek individualized exemptions, the University must explain why it chose not to grant any to plaintiffs. And it did not fairly do so here.

For these reasons, the motion for a stay of the preliminary injunction and the district court's proceedings pending appeal is **DENIED**.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk